Estate of James R. Jewett, George F. Jewett, Executor v. Commissioner.
Estate of James R. Jewett v. Commissioner
Docket No. 13814.
United States Tax Court
1949 Tax Ct. Memo LEXIS 143; 8 T.C.M. (CCH) 611; T.C.M. (RIA) 49163; June 24, 1949
*143 1. Petitioner is entitled, under section 23 (k) (1) of the Internal Revenue Code, to the deduction of the amount of $40,670.60, representing a deficiency resulting from a foreclosure sale of certain properties of Cape Code Farms, Inc., as a bad debt which became worthless in the year 1942. 2. Petitioner's claim of a bad debt deduction in the amount of $8,120.36 for the year 1942, or the taxable year 1943, is disallowed for failure of proof. Samuel S. Dennis, 3rd, Esq., James D. St. Clair, Esq., and J. N. Welch, Esq., for the petitioner. Leo C. Duersten, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency in income and victory tax for the period *144 January 1 to March 31, 1943, in the amount of $28,592.43. The deficiency determined in the deficiency notice was in the amount of $26,284.37. The parties have agreed that by reason of a mathematical error of the respondent, the deficiency was understated by the amount of $2,308.06, and that the correct amount is $28,592.43. The issues presented are: (1) Whether the respondent erred in disallowing as bad debt deductions for the taxable year the amount of $40,670.60 and $8,120.36. The year 1942 is involved because of the Current Tax Payment Act of 1943. (2) Whether the determination of the deficiency is prevented by reason of the limitation provided in section 275 (a) of the Internal Revenue Code. The case was presented on a stipulation of facts, depositions, oral testimony and exhibits. The facts as stipulated are so found. Facts found which were not stipulated are found from the evidence. Findings of Fact Petitioner is the executor of the estate of James R. Jewett, deceased, who died on March 31, 1943. Decedent filed his individual income tax return for the calendar year 1942 on March 11, 1943, with the collector of internal revenue for the district *145 of Massachusetts. The individual income tax return for the period January 1 to March 31, 1943 was filed by the executor of the estate of decedent on June 15, 1943, with the collector of internal revenue for the district of Massachusetts. An individual income tax return on which is stamped "Amended Return" was filed by the executor of the estate of decedent with the collector of internal revenue for the district of Massachusetts, recomputing decedent's tax liability in accordance with the provisions of the Current Tax Payment Act of 1943. The respondent's notice of deficiency in income and victory tax liability of decedent for the taxable year ended December 31, 1943 was sent by registered mail on February 13, 1947. Cape Cod Farms, Inc., a Massachusetts corporation with its principal place of business at Hyannis, Massachusetts, was incorporated on July 2, 1931 by T. E. Clifton. From 1931 to 1942 it was engaged in the business of manufacturing and selling, at wholesale and retail, varieties of jellies, marmalade and relishes. At first, the products of Cape Cod Farms, Inc. were sold directly to well-to-do homes in the area, and then through sales along the roadside. As a result of the *146 success of roadside selling, the corporation commenced erecting little buildings called jelly houses. A substantial part of its sales from 1938 to 1941, inclusive, were made through roadside or jelly houses. During the years 1940 to 1942, Cape Cod Farms, Inc. owned, operated and had under franchise approximately 25 jelly houses. Approximately 18 were under franchise and the balance were operated by the company, the individual operating the jelly house for the company receiving a commission based on sales. The books of the corporation showed a net operating loss for most of the years 1931 to 1942. In 1939 decedent became interested in Cape Cod Farms, Inc., through an employee of his who had bought the franchise of a jelly house in Cambridge, Massachusetts, and decedent subsequently made an investment therein. Between April and August 1940 decedent paid in the sum of $66,675 for stock, and in addition, for the account of his employee, Vieno Johnson, $3,125, which is not involved here. From the date of incorporation to July 25, 1940, the authorized capital stock of Cape Cod Farms, Inc. consisted of 1,000 shares of no-par value common stock and 800 shares of $25 par value preferred *147 stock. On July 25, 1940, authority was secured to issue 570 shares as six per cent accumulated preferred stock of the par value of $100. During the period April 26, 1940 to August 21, 1940, 384 shares of the $25 preferred, 542 shares of six per cent accumulated preferred of the par value of $100, and 86 shares of no-par common stock were issued to decedent by Cape Cod Farms, Inc. In September 1940 and subsequently thereto, various conferences and negotiations were had between attorneys representing the decedent and Cape Cod [*] respecting the issuance of the [*] stock to decedent, and his [*] ower. A question arose as to [*] validity of the issuance of the stock under the Massachusetts "Blue Sky" law. It was finally agreed that the sale of the stock would be rescinded and that the decedent and Vieno Johnson would surrender such stock as had been delivered to them in return for a mortgage from the corporation in the face amount of $60,000. On October 14, 1940, Cape Cod Farms, Inc., by T. E. Clifton, its treasurer, executed a promissory note in the amount of $60,000, payable in three years with interest at three per cent. The board of directors authorized the treasurer *148 to execute a mortgage on certain of the corporation's real property, securing the payment of the note. On the same date the treasurer executed a chattel mortgage covering substantially all of the personal property except accounts receivable, inventory and motor vehicles. As of October 14, 1940, the assets of Cape Cod Farms, Inc. exceeded its liabilities, including the $60,000 mortgage of the decedent, by about $18,395.81. Sales in 1941 increased over the previous year, but an increase in operating costs resulted in a small loss for that year. The declaration of war in 1941 and the imposition of gasoline and sugar rationing seriously affected the operations of Cape Cod Farms, Inc. The rationing of gasoline had an adverse effect on the business done by the jelly houses which catered to tourists and travelers. The rationing of sugar made it difficult for the corporation to continue its mail order and wholesale business. Clifton endeavored to get jelly contracts from the Government. Unable to secure a jelly contract, he obtained a Government contract to can mackerel. This contract was completed in the Summer of 1942 and resulted in a loss. Thereupon the corporation stopped doing business. *149 Clifton took a physical examination to secure a commission in the Army. He was advised of his acceptance and was preparing to enter the Army when he received word that the Government was interested in the purchase of some jams and jellies. He was advised he might receive a Government contract for $9,000. He went to the First National Bank of Yarmouth, the Hyannis Trust Company and a Government agency in Boston for financial assistance, but due to the financial condition of Cape Cod Farms, Inc. was unable to procure such assistance. On December 30, 1942, Clifton was notified that the Government was awarding a contract for the manufacture of plum jam totaling $9,000, and a contract was awarded to Cape Cod Farms, Inc., January 8, 1943. Clifton, being unable to finance the Cape Cod Farms, Inc. which would, therefore, not meet the conditions of the award, followed the advice of Mr. Hagerty of the Reconstruction Finance Corporation that he form a new corporation which the Reconstruction Finance Corporation would finance. On January 3, 1943, a new corporation was organized under the name of Cape Cod Food Products, Inc. The $9,000 jam contract was transferred to Cape Cod Food Products, Inc. *150 , under a subcontract form to comply with the Federal law prohibiting direct assignments. The loan was administered by the First National Bank of Yarmouth, which took an assignment of all moneys due under the contract. Cape Cod Food Products, Inc. performed the contract. Cape Cod Farms, Inc. defaulted on its interest payment on the mortgage note of $60,000 due October 14, 1942. Foreclosure proceedings were instituted and the property was sold on December 28, 1942, at a public sale. There were three bidders at the sale, and the property was bid in on behalf of the decedent for a total amount of $19,400, i.e., $19,000 for the real estate and $400 for the personal property. The deficiency existing after the sale on foreclosure was $40,600, plus $70.60 cost of the foreclosure, or $40,670.60. Subsequent to December 28, 1942, Cape Cod Farms, Inc. did no further business. No receiver was ever appointed and no proceedings in bankruptcy were ever instituted. The corporation was never dissolved by the stockholders. Its adjusted balance sheet as of December 31, 1942 disclosed that the only assets it then owned were three secondhand motor vehicles worth about $800 or $900. It owed $4,712.93 *151 to trade creditors, and such part of $23,611.79 in notes payable as remained unsatisfied after repossession by conditional vendors, in addition to the deficiency on the decedent's mortgage. On decedent's income tax return for the calendar year 1942, a deduction in the amount of $40,670.60, representing the difference between the face amount of the mortgage of $60,000 and the bid price of the property purchased at the foreclosure sale of $19,400, and the expense of the foreclosure amounting to $70.60, was claimed as a bad debt. The respondent disallowed the deduction on the ground that the debt was not worthless in 1942. The mortgage debt to the extent of the deficiency in the amount of $40,670.60 became worthless in the taxable year 1942. On or about September 10, 1940, decedent loaned $6,000 to Harry Sullivan of Miami Beach, Florida. On February 28, 1941, Sullivan executed and delivered his promissory note in the amount of $6,000, payable to decedent on or before five years after date and bearing interest from September 11, 1940 at five per cent. Sullivan invested the $6,000 in Curtis Enterprises, Inc., and became the owner of five shares of its capital stock, approximately *152 one half of the outstanding shares. Sullivan was not an officer or director. From October 1, 1940 to March 1, 1941, Sullivan was general manager of the corporation. In October 1940 Curtis Enterprises, Inc. acquired a deep-sea fishing vessel with the proceeds of the sale of stock to Sullivan. Curtis Enterprises, Inc. was engaged in the operation of charter boats and rental docks at Gulf Docks, Miami Beach, Florida. It also operated sight-seeing boats and deep-sea fishing boats. It sold gasoline to vessels operated by others. In 1940 Curtis Enterprises, Inc. operated a sight-seeing boat called the "Bay Queen" and a deep-sea fishing vessel called the "Sea King." A controversy arose between Sullivan and Norman Curtis, the president of Curtis Enterprises, Inc. Sullivan retained Lyle D. Holcomb, an attorney, who instituted a suit in the Circuit Court for the Eleventh Judicial Circuit of Dade County, Florida, against Curtis and others, charging various acts of misconduct and praying for an accounting and the appointment of a receiver. From February 27, 1941 to March 4, 1941, Curtis Enterprises, Inc. was operated by a receiver appointed by the court. From March 4, 1941 to November 12, 1943, Lyle *153 D. Holcomb operated Curtis Enterprises, Inc., as receiver under the order of the court. On June 5, 1944, a final judgment was entered pursuant to a stipulation. The receiver, Lyle D. Holcomb, turned over to Sullivan all the assets acquired throughout the course of the receivership, which included all the stock, the vessels, "Bay Queen" and "Sea King," together with their equipment, and other unidentified assets. The "Sea King" was turned over to creditors in discharge of liens which they held against the "Bay Queen." Between his acquisition of the "Bay Queen" and April 1946, Sullivan invested at least $8,500. On April 1, 1946, Sullivan sold a one-half in-interest in the "Bay Queen" to Peter J. Francis for $4,000. Since April 1946, Sullivan has invested an additional amount of $3,500 in the "Bay Queen." During the years 1941 and 1942 decedent advanced to Lyle D. Holcomb, on behalf of Sullivan, the sum of $2,245.36 for legal fees and expenses in connection with Sullivan's litigation against Curtis Enterprises, Inc. Sullivan agreed to repay decedent for these advances. From June 1941 until about the time of decedent's death, Holcomb and decedent corresponded with regard to the progress *154 of the litigation. During the same period Sullivan and the decedent carried on a correspondence. The decedent never made any demand upon Sullivan for the payment of the $6,000 or the additional advances in connection with the litigation. During 1943 decedent did request Sullivan to pay the interest on the note. From January to March 1941, Sullivan was employed by Curtis Enterprises, Inc. at a weekly salary of $30. During the balance of 1941 he was self-employed in newspaper work. His total compensation for the year 1941 was $2,215. During the years 1942 to 1945, inclusive, Sullivan was employed as a reporter for the Miami Beach Tropics newspaper. His annual salary for the respective years 1942, 1943, 1944 and 1945 was $2,000, $2,600, $3,380 and $3,380. In his individual tax return for the calendar year 1942, decedent claimed no deduction on account of Sullivan's indebtedness to him. In the decedent's tax return for the year 1943, the executor of his estate claimed no deduction on account of Sullivan's indebtedness to the decedent. On March 11, 1947, petitioner filed a claim for refund on Form 843, based on a claim for a bad debt deduction arising out of the $6,000 loan and the *155 additional advances of $2,245.36 allegedly becoming worthless in 1942. A similar claim for refund, based on the alleged worthlessness of such indebtedness becoming worthless during the period January 1 to March 31, 1943, was also filed. Petitioner has failed to establish that the indebtedness of Sullivan to the decedent in the amounts of $6,000 and $2,245.36 became worthless during the year 1942 or during the period January 1 to March 31, 1943, the date of decedent's death. Opinion The issues, on the merits, relate to the deductibility of certain amounts as bad debts of decedent alleged to have become worthless in the year 1942. The deficiency determined relates to the taxable year 1943. By reason of the provisions of the Current Tax Act of 1943, the year 1942 is also involved. On his income tax return for 1942 the decedent claimed a bad debt deduction in the amount of $40,670.60, being the difference between the sale price on foreclosure and the amount of the mortgage indebtedness. The respondent disallowed the claimed deduction on the ground that the debt did not become worthless in the year 1942. Under section 23 (k) (1) of the Internal Revenue Code *156 , provision is made for the deductibility of "debts which become worthless in the taxable year." The question of worthlessness is one of fact, with the burden of proof resting on petitioner. We have found as a fact that the indebtedness, in the amount of $40,670.60, of the Cape Cod Farms, Inc., to the decedent, became worthless in the taxable year. We shall, therefore, summarize the pertinent evidence which we think supports that finding. Cape Cod Farms, Inc. was engaged in the manufacture and sale, at wholesale and retail, of jellies, marmalade and relishes. Between April and August 1940, decedent invested in that corporation at least $66,675 on his own account and $3,125 for the account of his employee, Vieno Johnson, for which investment he was to receive shares of the preferred stock and a certain amount of common stock as a bonus. A dispute arose between the decedent and Clifton, the originator of the business, which was amicably adjusted. Pursuant to the agreement of the parties, the decedent and Vieno Johnson surrendered to the corporation all the stock that had been issued to them. The corporation thereupon executed and delivered its promissory note in the amount of $60,000, *157 payable in three years and bearing three per cent interest payable quarterly. As security for the note, the corporation executed and delivered a mortgage on certain real estate and also a chattel mortgage covering certain personal property then owned by the corporation. The parties exchanged mutual releases. The advent of war in December 1941 and the subsequent governmental regulations rationing gasoline and sugar seriously affected the operations of the business. Unsuccessful attempts were made to secure Government contracts. A small Government contract for canning mackerel was obtained in 1942. This contract was completed in the Summer of 1942, and resulted in a loss. Cape Cod Farms, Inc. then ceased operations, and Clifton applied for a commission in the Army. He was accepted. Just before accepting the commission, Clifton received word that Cape Cod Farms, Inc. might be awarded a Government contract of $9,000 for the manufacture of plum jam. He endeavored to secure financial assistance to enable that company to accept and complete the contract, but, due to its financial condition, he was unable to do so. On December 30, 1942, Clifton was advised that the Government was awarding *158 a contract for $9,000 to Cape Cod Farms, Inc., and the contract was awarded January 8, 1943. Being unable to finance the Cape Cod Farms, Inc. and accept the contract, Clifton took the advice of Mr. Hagerty of the Reconstruction Finance Corporation to form a new corporation which the Reconstruction Finance Corporation would finance. On January 3, 1943, a new corporation was formed under the name Cape Cod Food Products, Inc. The $9,000 contract was assigned to the new corporation. The loan was administered by the First National Bank of Yarmouth, which took an assignment of all moneys due under the contract. The new corporation did not assume any of the liabilities of Cape Cod Farms, Inc. The latter corporation did no business after 1942. It was not dissolved by the stockholders. It continued its existence and filed certificates of condition with the Commonwealth of Massachusetts. The adjusted balance sheet of Cape Cod Farms, Inc. discloses that as of December 31, 1942, the only assets consisted of three secondhand motor vehicles, of a value approximating $900. It owed $4,712.93 to trade creditors, $23,611.79 in notes payable, or such part thereof as remained unsatisfied after repossession *159 by conditional vendors, in addition to the aforesaid indebtedness to the decedent. Upon the facts disclosed by this record, we have concluded that the deficiency resulting after the sale on foreclosure of the mortgaged property of the Cape Cod Farms, Inc. was uncollectible and that legal action to enforce payment would have involved additional expenditures in excess of any eventual recovery. The existence of such circumstances is recognized by the Treasury Regulations as sufficient evidence of worthlessness of the debt for the purpose of deduction. Regulations 111, sec. 29.23 (k)-1 (b). We, therefore, conclude that the respondent erred in disallowing decedent a deduction of the amount of $40,670.60 as a bad debt which became worthless in the year 1942. In the petition filed herein, petitioner alleges that decedent was entitled to a bad debt deduction in 1942, or the taxable year 1943, in the amount of $8,120.36, representing a loan to Harry Sullivan in the amount of $6,000 and additional advances to Sullivan in the amount of $2,120.36 for attorney's fees and expenses incurred in a suit by Sullivan against Curtis Enterprises, Inc. Neither of the amounts was claimed on decedent's *160 returns for either year. On March 11, 1947, petitioner filed a claim for a refund for the respective years 1942 and 1943, based on the alleged worthlessness of Sullivan's indebtedness to the decedent. The record establishes that in September 1940 decedent advanced to Harry P. Sullivan the amount of $6,000 to enable the latter to purchase an interest in Curtis Enterprises, Inc. On February 28, 1941, Sullivan executed and delivered to decedent a promissory note in the amount of $6,000, payable on or before five years from the date thereof, with interest at five per cent. Sullivan became involved in a controversy with his associates in the Curtis Enterprises, Inc. and litigation ensued. The decedent advanced certain amounts to Sullivan for counsel fees and expenses in carrying on such litigation. On June 5, 1944, a final judgment was entered pursuant to stipulation. Under the, judgment Sullivan received all of the then remaining assets of Urtiss Enterprises, Inc. Since the promissory note was not due and payable prior to February 28, 1946, the decedent could not demand payment prior to the maturity date and no demand was in fact made. Sullivan testified that the decedent intended that *161 the advances were to be repaid only out of the proceeds from Sullivan's interest in Curtis Enterprises, Inc. Even if we accept this testimony of the debtor as establishing such fact, the record clearly indicates that at no time during the years 1942 or 1943 could the interest of Sullivan in Curtis Enterprises, Inc. be said to be worthless. We, therefore, have concluded that petitioner has not sufficiently established that Sullivan's indebtedness to the decedent was in fact worthless in either 1942 or 1943. Our determination of the issues upon the merits renders it unnecessary to pass upon the technical issue raised by petitioner, that the respondent's notice of deficiency was not timely and within the period of limitations provided in section 275 (a) of the Internal Revenue Code. Decision will be entered under Rule 50.